## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-78-TSC** |
| **MATTHEW HONIGFORD,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Matthew Honigford to 27 months' incarceration, which is the midpoint of the Guidelines range as calculated by the parties, 36 months' supervised release, $2,000 in restitution, and the mandatory $100 assessment.

### I.        INTRODUCTION

The defendant, Matthew Honigford, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Honigford, a former member of the United States Army National Guard from Ohio, was at the front of a group of rioters that overwhelmed a police line on the Southwest Plaza of the Capitol grounds at approximately 2:30 p.m. to gain access to a set of stairs. There, Honigford held a United States flag on a flagpole horizontally in front of him and pushed it into the chest of one officer from the Metropolitan Police Department, Officer S.B. Officer S.B. grabbed onto the flagpole to push it away, and a brief struggle over the flagpole ensued. After Honigford and his fellow rioters eventually pushed past that police line, he and others advanced up the set of stairs to the Upper West Terrace and assembled on the steps in front of a second police line, where officers were using metal bike racks to form a barrier against the crowd. Honigford repeatedly reached over the bike racks to touch or attempt to touch MPD officers with his hands, stating he was praying for them. When officers asked him to stop, Honigford responded, "How am I supposed to bless you guys?" He continued to reach his hands out toward the officers until other rioters told him to stop, and he turned toward them to say, "I'm trying to f--- pray, guys." At 2:46 p.m., Honigford grabbed one of the metal bike racks in front of him and used his body to push the barrier against the law enforcement line. When MPD Officer J.M. pulled on Honigford's jacket in an attempt to prevent him from pushing the barrier, Honigford responded by leaning away and kicking the bike rack into Officer J.M. with his feet. Honigford went on to berate officers verbally, shouting at them that they would be "fighting for [their] lives tonight."

The government recommends that the Court sentence Honigford to 27 months' incarceration, which is the midpoint of the applicable Guidelines range. A 27-month sentence

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

reflects the gravity of Honigford's conduct, which included multiple assaults and threatening language against police officers.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 22, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Matthew Honigford's Role in the January 6, 2021 Attack on the Capitol

Honigford, who at the time was a member of the United States Army National Guard, traveled to Washington, D.C. from Ohio with his mother to attend the Stop the Steal rally outside of the White House on January 6, 2021. Honigford had by that point been reported Absent Without Leave ("AWOL") from his drill obligations, having stopped attending drill weekends shortly after the presidential election in November 2020. According to Honigford's drill sergeant, who was interviewed by FBI prior to Honigford's arrest, Honigford told him that his sister was sick and that he needed to be able to help her, and that he did not trust the state of the country following the election of Joe Biden.[2]

After the rally on January 6, Honigford and his mother separated, and Honigford advanced with a crowd to the United States Capitol grounds.

_____

[2]  After his arrest, Honigford told FBI agents he had gone AWOL from the military mainly because of COVID and concerns about vaccinations.

3

*Lower Southwest Plaza and Assault on Officer S.B.*

At approximately 2:29 p.m., a crowd of rioters were assembled on the Southwest Plaza of the Capitol Grounds, at the base of a set of stairs leading up to the Upper West Terrace under bare scaffolding that was under construction for the upcoming Presidential Inauguration. A group of police officers from the Metropolitan Police Department (MPD) had formed a line using a combination of officers and bike rack barricades to keep the crowd from accessing the stairs. Honigford was positioned at the front of the crowd on the south side of the group, carrying an American flag on a flagpole. *See* Exhibit 1 at 1:27.[3]



*Figure 1: Defendant (circled in red) facing off with officers on the Southwest Plaza; screenshot from Exhibit 1 at 1:27.*

At approximately 2:29 p.m., body-worn camera (BWC) footage from an MPD officer captured Honigford shouting at officers, "You better think f—ing twice. You are about to meet a million pissed off f—ing people. You don't have to do this. You don't have to do this." Exhibit 2

---

[3] The government's video exhibits to accompany this memorandum are submitted herewith via USAfx.

at 0:00-0:27. Then, at approximately 2:30 p.m., Honigford leaned down, picked up a water bottle

from the ground, and waved it in the air as if threatening to throw it at officers. Seeing this, an

officer shouted, "Don't do that, don't throw that." Honigford kept holding onto the water bottle

while shouting, "Do your f—ing job and arrest those c—suckers in there. Do your job! Do your

job! Do! Your! Job!" Exhibit 2 at 0:27-0:39.[4]



*Figure 2: Defendant waving a water bottle at officers; screenshot from Exhibit 2 at 0:27.*

Defendant grew increasingly agitated while yelling at officers, shouting "Bitch!" as he

started to move forward, then chanting "Push!" to the crowd that advanced behind him. Exhibit 2

at 0:50-1:00. At approximately 2:30:35 p.m., Honigford moved his flagpole horizontally in front

of him and pushed it into MPD Officer S.B.'s chest area.

---

[4] Mr. Honigford appears to have been referring to members of Congress, based on statements he made in another interaction with officers where he also referred to lawmakers as "c—suckers." *See infra* p. 15.



*Figure 3: Defendant holding his flagpole horizontally in front of Offer S.B.'s body worn camera; screenshot from Exhibit 2 at 1:01.*



*Figure 4: Open-source photograph of Defendant, circled in yellow, pushing his flagpole into Officer S.B.'s chest.*

Officer S.B. grabbed onto the flagpole to push it away. Honigford continued struggling with Officer S.B. over the flagpole for approximately 20 seconds, shouting "I don't want to do this." Exhibit 2 at 1:00-1:20. At approximately 2:30:52 p.m., Officer S.B. pushed the flagpole downward and released his grip. Thereafter, Honigford moved the flagpole into a vertical position and held it with both hands, while he continued shouting at officers: "Nobody wants to do this. You have a choice right now. Right now." Exhibit 2 at 1:01-1:30.



*Figure 5: Defendant and Officer S.B. struggling over Defendant's flagpole; screenshot from Exhibit 3 at 1:55.*

As the crowd behind him erupted into a USA chant, Honigford shouted "forward!" and raised his right hand in a gesture of encouragement. He then taunted officers: "There's no one behind you. There are a million of us." Exhibit 2 at 1:30-2:00.

As the crowd continued to amass, police were forced to retreat up the stairs inside the bare scaffolding. Honigford and other rioters moved forward up the stairs.

7



*Figure 6: Defendant (circled in red) at the front of a group of rioters breaching the stairs; screenshot from Exhibit 1 at 4:19.*

### Upper West Terrace and Assault on Officer J.M.

By approximately 2:44 p.m., Honigford and the group of rioters had advanced to the top of the stairs and onto the Upper West Terrace. Rioters assembled on the steps in front of the police line that officers formed there with metal bike racks to act as a barrier against the crowd. Honigford was again at the front of the crowd of rioters and encouraged other rioters to move toward the police line by repeatedly yelling, "Up!" and moving his hands in a gesture to bring people toward where he was standing. Exhibit 4 at 0:35-0:50.

From approximately 2:44 to 2:46 p.m., Honigford repeatedly touched or attempted to touch MPD officers with his hands, stating that he was praying for them. Exhibit 4 at 0:15-2:00.



*Figure 7: Defendant reaching out to touch an officer, stating he was praying for them; screenshot from Exhibit 4 at 0:27.*

When officers asked Honigford to stop, Honigford responded, "How am I supposed to bless you guys?" He continued to reach his hands out toward the officers over the line of bike racks separating them until other rioters told him to stop and he turned toward them to say, "I'm trying to f—ing pray, guys." Exhibit 5 at 0:00-0:20.

9



*Figure 8: Defendant attempting to touch an officer while praying; screenshot of Exhibit 5 at 0:05.*

At approximately 2:46:36 p.m., Honigford grabbed the metal bike rack in front of him and bent his knees, crouching down and using his body to push the barrier against the police line.



*Figure 9: Defendant pushing metal bike rack into police line; screenshot from Exhibit 5 at 0:36.*

In response, Officer J.M. pulled on Honigford's jacket in an attempt to prevent him from pushing the barrier. Honigford then leaned away and kicked the metal bike rack against Officer J.M.

11



*Figure 10: Officer J.M. pulling on Defendant's jacket to attempt to prevent him from the pushing the metal bike rack; screenshot from Exhibit 5 at 0:41.*



*Figure 11: Defendant kicking the bike rack into Officer J.M.; screenshot from Exhibit 5 at 0:44.*

When interviewed about the incident, Officer J.M. stated that as Honigford was kicking the barrier, the barrier hit him. Officer J.M. also stated that when he was attempting to grab Honigford, Honigford punched or hit his hand.

Simultaneous with Honigford's assault on Officer J.M., other rioters to the right of Honigford separated sections of the bike rack barriers and broke through the law enforcement line. After kicking the barrier into Officer J.M., Honigford moved along with other rioters toward the break in the barriers. He then grabbed onto one of the barriers and pulled, shouting to other rioters to "pull it down." Exhibit 5 at 1:04-1:07. Honigford proceeded to carry the barrier into the crowd and away from law enforcement officers.



*Figure 12: Defendant grabbing a bike rack while shouting to other rioters to "pull it down"; screenshot from Exhibit 5 at 1:06.*

Police were forced to retreat and establish a new line higher up the stairs, and they used chemical irritants to temporarily disperse the crowd. As the crowd hesitated on the stairs,

Honigford again made his way to the front and walked up the stairs towards the new police line. Honigford picked up a long silver pole and moved toward the police line with the pole held out horizontally. As Honigford approached, the officers held out their hands to receive the pole. Honigford stated, "I don't want us to have this" as he gave the pole to officers. He then shouted at officers, "Guys, there's a million people here! A million!" Exhibit 5 at 1:47-2:00.



*Figure 13: Defendant handing up a silver pole to officers; screenshot from Exhibit 5 at 1:49.*

### Upper West Terrace and Screed against Officers

By approximately 3:00 p.m., Honigford had made his way to an elevated ledge just to the right of the stairs where he had assaulted Officer J.M. Honigford, and above officers. At approximately 3:01 p.m., Honigford crouched down in front of officers and yelled in their faces:

There are people that want to hang people. They don't want to hang you. They don't want to hang any of you guys. They want to hang these c—suckers inside this building, who scurried like cockroaches when we started to storm. And then what do they do? They send you to do their bidding, to do their dirty work. They don't want to get their nails clean… dirty. They're too clean. Nancy Pelosi's got a f—ing $20,000 fridge with $10 pints of ice cream in them. What the f—do you have in your house? What the f—do you make? This is your life that you might be putting on the line. And Nancy Pelosi's going to go back to San Francisco with her Jeni's ice cream and her $20,000 fridge, and guess what you're going to be doing? You're going to be fighting for your lives tonight. If you keep this up, you will be fighting for your lives as Nancy Pelosi finger f—s her p— tonight and says, 'Yeah, thank God I got out of those… that way.' Jesus f—ing Christ, guys. God is dead on this side. None of you wanted to pray. None of you wanted to join hands and join in a prayer. None of you did. None of you wanted to take a St. Christopher medal, 'cause I wanted to protect you guys. None of you wanted that. Do you know what is coming? What is down these steps? There is a storm down there. That is not [unintelligible] changed by you guys.

Exhibit 6 at 0:00-1:38. Honigford left Capitol grounds shortly thereafter. He did not enter the United

States Capitol building.



*Figure 14: Defendant yelling at officers on the Upper West Terrace; screenshot from Exhibit 6 at 0:04.*

### III.     THE CHARGES AND PLEA AGREEMENT

On February 9, 2024, pursuant to the parties' plea agreement, ECF No. 21, and Honigford's agreement to waive indictment, ECF No. 24, Honigford was charged by information with a single count of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1), for his assault on Officer J.M. On February 21, 2024, Honigford was convicted of that offense based on a guilty plea entered pursuant to the plea agreement.

### IV.     STATUTORY PENALTIES

Honigford now faces sentencing on one count of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years' imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As stated in the plea agreement and the PSR, the Guidelines calculation for the offense is as follows:

<u>Count One: 18 U.S.C. § 111(a)(1)</u>

| | | |
|---|---|---:|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2 | Specific Offense Characteristics – Official Victim | 6 |
| | **Total** | **20** |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1) | | -3 |
| **Total Adjusted Offense Level**: | | **17** |

*See* Plea Agreement at ¶ 4(A).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and meet certain additional criteria. Section 4C1.1 does not apply in this case because Honigford used violence in connection with his offense. U.S.S.G. § 4C1.1(a)(3). Specifically, Honigford used his body to push a bike rack against a line of police officers, including Officer J.M., on the Upper West Terrace, and when Officer J.M. attempted to stop him, Honigford kicked the bike rack into Officer J.M. Additionally, Honigford pushed his flag pole horizontally against Officer S.B.'s chest on the Southwest Plaza, and shouted at officers on the Upper West Terrace that "this is your life you may be putting on the line" and "you're going to be fighting for your lives tonight." Such acts amount to the use of violence and credible threats of violence.   U.S.S.G. § 4C1.1(a)(3); *see also United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5 (defining "violence" and the "credible threat of violence" under § 4C1.1). Thus, Honigford is not eligible for the two-point reduction under § 4C1.1. PSR ¶ 41.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 45. Accordingly, based on the government's calculation of the defendant's

total adjusted offense level, after acceptance of responsibility, at 17, Honigford's Guidelines imprisonment range is 24 to 30 months' imprisonment. This calculation matches the agreed-upon Guidelines range calculation in Honigford's plea agreement.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the § 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Honigford's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. For his part, Honigford assaulted Officer J.M. by pushing and ultimately kicking a bike rack barrier into him in an attempt to breach a police line. Although he is only charged with a single count of assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1) for this conduct, Honigford also assaulted Officer S.B. with a flagpole on the Southwest Plaza, and later threatened officers on the Upper West Terrace that they would be "fighting for [their] lives tonight." The nature and circumstances of Honigford's offense were of the utmost seriousness, and fully support the government's recommended sentence of 27 months' incarceration.

### B.  The History and Characteristics of the Defendant

The defendant is a former member of the United States Army National Guard who, according to the government's investigation, was reported Absent Without Leave from his drill obligations after the presidential election in November 2020, and ultimately was honorably

discharged for completion of his enlistment commitment in March 2022.

The defendant has been married since November 2022 and has three young children—a daughter born in December 2022, a daughter born in July 2024, and the five-year old daughter of his wife from a previous relationship, whom the defendant legally adopted in September 2023. He is the sole provider in his family. From May 2020 until her death in 2022, the defendant was a full-time caretaker for his sister, who was ill with leukemia and complications from COVID-19. The defendant has no criminal history.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Matthew Honigford's criminal conduct on January 6 was the epitome of disrespect for the law, particularly as his offense involved a direct assault on a law enforcement officer.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a lengthy term of incarceration. Specifically, although the defendant told FBI agents following his arrest that he did not recall assaulting officers and that he was "extremely emotional" while he was at the Capitol on January 6, his repeated assaults and his threatening statements to law enforcement officers over the course of approximately half an hour during a riot demonstrate deliberate behavior rather than a mere loss of control in the heat of the moment. His statements to officers in Exhibit 6 in particular prove that Honigford acted with awareness of the gravity of his conduct, which included making violent threats to officers facing thousands of rioters: "You're going to be fighting for your lives tonight," he shouted. "Do you know what is coming? What is down these steps? There is a storm down there." Honigford understood at the time that he was part of a violent riot that was endangering officers' lives.

His comments in that same screed also demonstrate vitriol toward lawmakers. Honigford referred to congresspeople as "c—suckers . . . who scurried like cockroaches when we started to storm," and he made graphic, vulgar statements about Nancy Pelosi. When coupled with Honigford's assaults on police, this heated rhetoric is deeply troubling and demonstrates a need to specifically deter future acts of political violence.

## E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*,

671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7] While no previously sentenced case contains the same balance of aggravating and mitigating

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Clifford Mackrell*, 21-cr-276 (CKK), Clifford Mackrell, who traveled to Washington, D.C. from Ohio with his father Michael, engaged with and assaulted officers who had formed a line on the West Front of the Capitol. Over a period of approximately 7 minutes, Mackrell engaged in multiple assaults, including striking and pushing officers, pulling at an officer's gas mask, lunging at an officer's face, and using a large sheet of plywood to push into the police line. He later bragged on social media that "the cops got there [sic] ass handed to them." Following a guilty plea to a single count of assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1), the Court sentenced Mackrell to 27 months' incarceration, 36 months of supervised release, and $2,000 in restitution.

A comparable sentence is warranted here. While Mackrell committed multiple assaults in one location over a 7-minute period, Honigford committed two separate assaults over an approximately 115-minute period, in two separate locations on Capitol Grounds. Honigford also made statements evincing contempt for law enforcement—not on social media, after the fact, but during the events of the day, when Honigford repeatedly berated officers verbally as part of the violent mob, threatening them in a moment when they were already outnumbered and overwhelmed.

In *United States v. Jason Owens*, 21-cr-286 (BAH), Owens confronted police officers on the West Front of the Capitol, where they had formed a line behind bicycle racks to stop the rioters' forward progress. As other rioters began assaulting officers, Owens joined in by shoving one officer's helmet with such force that the officer's head snapped backwards. Later, Owens moved

toward the East Rotunda Door on the opposite site of the building, where he and other rioters tried to breach the Capitol. During his attempt to get inside the building, Owens joined a group of rioters streaming through the East Rotunda Door, but was pushed out by officers shortly afterward. Once outside, one officer guarded the door by standing between it and the rioters. Owens then grabbed onto the officer's baton. The two then pushed each other back and forth for a short period of time. Following a guilty plea to a single count of assaulting a federal officer, the Court sentenced Owens to a Guidelines sentence of 24 months' incarceration and 36 months' supervised release, and imposed a $2,000 fine.

Like Owens, Honigford engaged in altercations with officers at two separate locations and two separate times, in both instances while rioters were attempting to advance forward past the police. Accordingly, a comparable sentence is warranted here.

A higher sentence is warranted in this case than in *United States v. McNulty*, 23-cr-235 (TSC), where this Court sentenced McNulty to twelve months' and one day incarceration, 24 months' supervised release, 60 hours of community service, and $2000 in restitution, after a guilty plea to a single count of assaulting a federal officer. In that case, McNulty, who was in his early 20s at the time, joined a mob as it tried to breach the Capitol Building through a set of double doors on the Upper West Terrace of the Capitol. McNulty witnessed another rioter tackling an officer to the ground after she attempted to apprehend rioters who had deployed chemical irritant. McNulty quickly approached the officer and spread his arms wide against the rioters besides him in an apparent attempt to allow the officer to get back up. Later, however, when a large group of police officers began to clear the area of rioters, McNulty resisted their efforts to do so, pushing

against an officer's riot shield with increasing force and trying to wrest control of the shield from the officer, as other rioters nearby joined in the fight.

Unlike McNulty, Honigford assaulted more than one officer, having first pushed his flagpole into Officer S.B.'s chest before ultimately kicking a bike rack into Officer J.M. Also unlike McNulty, Honigford brought with him an object—a United States flag on a flagpole—that he could and did use as a weapon, and he made threatening comments to officers after committing his assaults. McNulty's case also involved mitigating conduct not present in the instant case, as McNulty helped one officer fend off an attack by other rioters. McNulty was also in his early 20s at the time of his offense, while Honigford was 28 and had served in the United States Army National Guard for over seven years by the time he participated in the siege on the United States Capitol. The differences between Honigford and McNulty thus suggest a higher sentence is appropriate in Honigford's case.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer J.M., did not suffer bodily injury as a result of Honigford's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Honigford must pay $2,000 in restitution, which reflects in part the role Honigford played in the riot on January 6.[9] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Honigford's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

## VIII.   FINE

The defendant's conviction for violation of 18 U.S.C. § 111(a)(1) subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. PSR ¶ 104.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' incarceration, which is the midpoint of the Guidelines range as calculated by the parties, and 36 months' supervised release, as well as order $2,000 in restitution and a mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Isia Jasiewicz*
Monika (Isia) Jasiewicz
Assistant United States Attorney
D.C. Bar No. 102491
U.S. Attorney's Office
District of Columbia
601 D Street NW
Washington, DC 20530
(202) 714-6446
isia.jasiewicz@usdoj.gov

27